May it please the court. The key issue presented in this employment based fraud case is whether the repeated numerous statements made by Mr. Hardy and Mr. Prophet about lobbying on behalf of plaintiffs so that he could get his stock options and that they would do everything they could so that he would get them and that a decision was coming out next month to Mr. Hardy and Mr. Prophet were false representations made knowing that they were false at the time or misleading or with a reckless disregard as to whether they were misleading. When the evidence is that Mr. Wilson had informed Mr. Prophet, Mr. Wilson who had access to the board, had informed Mr. Prophet in early summer and again in late summer that it was way too early to consider plaintiff's request and in fact it was too hypothetical to consider at that time. Mr. Prophet stated that he then told both Mr. Hardy and Mr. Plaintiff of that fact but the evidence is he did not. Plaintiff denies having been informed that Mr. Wilson thought it was too early to consider his request at any time. But how would your client have reacted differently? What reliance did your client put on the statement or the implication that the inference was not too early? The evidence is that he, to his detriment, put his life on hold for that year as he was waiting to get an answer that was promised repeatedly in the immediate future that he put his life on hold and gave up at least two serious opportunities as well as other opportunities that were discussed, other business opportunities. Separating out the time element from the rest of the alleged misrepresentations, what indication is there that if he'd known the decision wouldn't be made in August but would be made in November that that would have changed anything? Well, the evidence is that he asked repeatedly month after month after month trying to get this information and that his testimony in his interrogatory responses at ER 151I was that it was to his detriment that this was a chance of a lifetime to get into an auto dealership but instead in reliance upon the misrepresentations by both Mr. Hardy and Mr. Prophet that he forego those opportunities. And in his words, put his life on hold. But again, go back to the time. Suppose he had known all along they weren't going to make the decision until the end of the year. It really doesn't change his situation any. He can leave right away but he surely forgoes the options if he does. So focusing again on when the decision is to be made, is there evidence that suggests if he knew the decision wasn't going to be made until the end of the year he would forego the options and take the other opportunities? Well, there's no evidence that in hindsight he speculates he would have done that. The evidence is that he did do that. The evidence is he did forego the opportunities. But was that on reliance? I'm trying to separate out the alleged misrepresentations and you emphasized a timing of decision one, not the fact of decision, not whether or not he would be, his options would be granted or recognized or vested, but whether the decision was going to be made next month. And it's not quite so clear to me that there's a connection between his reliance upon or his hope that he's going to get the options vested and the timing of the decision. If they had told him flat out, as they allege they did, but I understand at this point we're accepting your client's representation, that no, decision's not going to get made until much later, is there any evidence, does he say, that well, if I knew they weren't going to make a decision until the end of the year I would have taken the other alternative? What I'm really saying is it seems to be the decision whether or not to vest, I understand, but the timing, I'm not sure that I understand the significance of a misrepresentation with regard to when the decision's going to be made. I agree with you that there's a qualitative difference in the two types of misrepresentations. As to the misrepresentation regarding the timing, the evidence is that he did forego the opportunities. There isn't a statement because of the misrepresentations regarding both timing and the efforts. There is no concrete statement in the record that had I known they would make the decision in November rather than next month, I would not have stayed. It is not that concrete, but at this stage of summary judgment a reasonable, not necessarily the only reasonable, but a reasonable inference of his repeated month after month going to them trying to get the information is that this is important to him, this is a factor in his decision making, and in fact he does forego, he says no to the other opportunities based on those misrepresentations. I think this court's recent decision in Arboro, and I may be mispronouncing it, v. Adidas, goes to that point. The question isn't whether it is a but-for determinative factor, the question is whether a reasonable person in plaintiff's position would have foregone or would be affected or was materially impacted by the misrepresentations. At this stage of summary judgment, I don't believe this court can say as a matter of law that a person who was faced with an opportunity to get a car dealership versus a stock option valued at over $300,000 would not have been impacted by the representations that they were doing everything they could to get him those $300,000 worth of stock options. Clearly there's intent to mislead him, sort of moving to another element. There is intent to mislead plaintiff when they know it's too early to consider the request and they continue to say we're working on it. You mentioned that he turned down a chance to have a car dealership. I understand the magistrate judge ruled that there were some vague discussions with this fellow about maybe he could invest in a car dealership and it was nothing really more than that. Yeah, the magistrate judge made a mistake there. It wasn't vague discussions. It was concrete, serious. The testimony is serious. Was there a written offer tendered to him? No, there wasn't a written offer tendered. There's no document other than the testimony itself that there was serious discussions, more than one discussion, and that he declined that opportunity. They had to have gotten to a certain stage of seriousness for him to decline the offer. I think the judge, by calling them casual conversations, totally misrepresents the factual evidence. Serious is not casual. Well, I mean, you call it serious, he calls it casual. What did they say? Did he say we offer you this and it's going to be X dollars? They didn't even pin down a price, did they? No. There isn't testimony one way or the other as to how much was the details of the serious discussion. Well, that's pretty vague. I mean, would you like to be in my car dealership? No. It's going to cost you X dollars and you have to do it by this date? I don't think that's the reasonable inference at summary judgment, Judge. Well, tell me what did the evidence show? Well, the evidence is presented on ER 151 and in the various pages in the interrogatories' responses, and it shows that he describes these as serious discussions that involved John Skinner, among others, and that he declined the offer. It had gotten to a point where it was concrete enough for him to be declining it. How much was he supposed to invest? That's not in the record. We don't know what the offer was. The offer was to eventually buy into the partnership of a car dealership in Medford and that those are rare opportunities and, quote, a chance of a lifetime. A chance of a lifetime, an inference of buying into a car dealership as a partner and a chance of a lifetime is not some vague, gosh, casual, I wish it maybe might have happened. It's an opportunity, a concrete opportunity. It's not some vague, amorphous possibility. It's discussed with the owner. It's presented to him as an opportunity, and he declined it. I'm unfortunately out of time. Thank you. May it please the Court. Good morning, Your Honor. There's a critical distinction in the record and circumstances in this case, one of several, actually. Can you talk up a bit for us? Yes, please. There's a critical distinction in the record and circumstances of this case compared to the record and circumstances of the various cases on which Mr. Fox relies in asking you to reverse the district court's judgment. One of those critical distinctions is that in each and every case that has been cited by Mr. Fox, and by both parties for that matter, is that there was a clear and distinct transaction going on between the parties that was the subject of the fraud claim and that in each case the plaintiff had made known to the defendant that some factor in that transaction was important to the plaintiff in determining whether to enter into the transaction or not. Just briefly, a couple of examples. In the Elizaga case versus Kaiser Hospital, which is cited repeatedly, the hospital was negotiating with a doctor in the Philippines to leave his practice in the Philippines to come here to the United States and work in a surgical preceptor. This is a different kind of case. They're not negotiating a deal for the future. But do you have doubt that if, for instance, what had happened here is that the company and its officials said to him, stick around until the end of the year. We promise you you're going to get the stock option. And he had done that, that he would have a claim when they intended the whole time not to? Your Honor, if I understand the question correctly, if the company had represented to the plaintiff, Mr. Fox, that he stuck around for the balance until the radio stations were sold, that he would get the stock options, yes, he would have a claim. Okay. So that's not the same kind of case as the others you're discussing either. So the difference isn't that this is a different kind of factual circumstance. The question is, were the representations such that somebody could reasonably rely on them and were they made and did he rely on them and were they made knowing them to be false or with willful disregard? Isn't that the issue? Well, if I could clarify, Your Honor, I think in each case decided in the briefs, there was a situation where the parties knew some type of transaction was going on. And the record here in this case, and actually the absence of the record, is that Mr. Fox never told anyone at Citadel that he was considering quitting Citadel and leaving. Mr. Hardy? It doesn't take a brain surgeon to figure out that somebody who knows the business is being sold is going to be considering his options. Absolutely, Your Honor. And you have to assume that the people making statements to him are making statements with the desire to encourage him to maintain his relationship so they have a manager for those stations until they're sold. The transaction or negotiation, if you want to call it that, that did occur in this case was right at the inception of the whole series of events. In January 1999, when Mr. Fox and the other managers were informed of this possible sale of their stations, they were offered a substantial bonus to remain during the term until the sale was completed. Mr. Fox accepted that offer by remaining, and he accepted the bonus, which was actually paid. So the only actual transaction, the only negotiation that occurred between the parties was the offer of the bonus. When was he paid the bonus? It's in the record he was paid the bonus in November 1999. So if he stayed, he would receive a bonus? He would receive a bonus. And so he stayed until the end. He might not have stayed until the end, is what Judge Clifton was saying, if he knew he wasn't going to get it. The bonus was $10,000, and the stock options were like a couple hundred thousand dollars. If the company thought the bonus would encourage him to stay to the end, they surely must have understood the stock options were a much bigger lure. And so any discussion with him about the likelihood of having those options vest could be expected to influence his decision whether or not to stay or consider other alternatives. Now, whether they knew the other alternatives, not many employers know of their employees considering alternatives. But it's not hard to figure out that people look out for their own interests, and in a situation where you know the company is being sold, you especially pay attention to what else is out there for you. So I understand the distinction you drew at the very outset, but I'm not sure I understand there's any real significance to it. But no one knew whether the options would be granted or not, and that was made clear throughout the entire process. But the allegation of the plaintiff is that he was told something else, not that they actually clarified it. He wasn't told, and you've got a good point on this, he wasn't told, stick with us, you'll be taken care of, we know, we can control this. It was made, he understood that the people he was talking to were not ultimately the decision makers on this. But he was not told, accepting as we must at this stage for summary judgment according to his evidence, he was not told, maybe you will, maybe you won't, we don't know, we'll wait and see. He, according to the evidence he submits, was clearly left with the impression that these people were working hard to accomplish that result and were trying to look out for him, even though they didn't have the power. And the evidence also suggests the reality was very different, that they were not pushing for that result. Well, could he have been influenced by that? Was it reasonable reliance? I mean, I think it's an arguable question, but I don't know that it's the fact that the company didn't know that he was considering alternatives excuses it from responsibility here. You surely have to understand that when a business is being sold and the employee knows it, the employee's got to think out loud for himself, gee, what's in it for me? What are my alternatives? What happens if this doesn't work out? But, Your Honor, Mr. Fox had every opportunity in this ten-month period to explain to Citadel that he was, in fact, being damaged by foregoing other opportunities. And the record shows, according to Mr. Hardy, that Mr. Hardy, for example, testified, Fox had told him he decided to stay with Marathon. He decided to stay with the purchaser. In fact, Mr. Hardy confirmed that in a subsequent e-mail, saying, Greg, you've told me several times that you're going to stay with Marathon. I can't talk to you about employment with Citadel. From the very beginning, from the January 1999 memo that came out after this first conversation, it indicates Citadel's understanding that the likelihood was that these managers would end up doing the same jobs with the buyer. The memo that came out said, please have your resumes together. We're flying in to talk with you. If I may briefly just touch on one other point, and it's been discussed here briefly, there is no concrete evidence of damages. There is no written contract. There was no proposed contract with the dealership, which appears to be the main claim. Mr. Fox was asked in deposition, what were the terms that you were discussing? And apart from an offer of a salary, which was the same or slightly less than the salary he was already earning, the other aspects of that alleged transaction or discussion were not fleshed out. There was no affidavit concerning the financial condition. There was no deposition testimony or document showing the financial condition of the dealership. There was no expert testimony. There was no business valuation. And I think as Judge Gelders correctly concluded, the jury had nothing in this record on which he could award damages because no one knows the terms of what might have ultimately been agreed to. Thank you. Thank you. If there's any more questions, I'll... Thank you very much. Thank you. I wanted to go back to Judge Silverman's question about the damages. In the page I cite, ER-151-1, there is a statement because of the representations, so I declined this offer from John Skinner, parentheses, and others. I believed that I would be better off to get the stock options and that their value would make it that much easier to invest in another job opportunity at some point in the future. So it's not a direct statement as to I stayed here because of, but it is clearly the inference from that is just that, that he did rely on the misrepresentations in order to advance himself. But back to the damages. Was there some statement about what he estimated his interest in this car dealership would have been worth in the record somewhere? I thought I said something about a million-something dollars that he said his interest would have been worth. I know the reference you're referring to, but I can't off the top of my head hold a cite for you. Yeah, I'm wondering how he could estimate what his interest would be worth if we didn't know what his interest would be. I think he didn't. I think there isn't evidence as to what his interest would cost. I think there was evidence that his interest was discussed. What percentage I don't believe is in the record, but that they had gotten to that level, I believe, that level of detail was in the record. And I agree that the fact that they don't know that I'm giving up these opportunities, he doesn't have to say to the employer, I'm giving up these opportunities when he's presented with a bonus and the employer is trying to entice him to stay due to a no material change clause in the pending sale agreement. Thank you. Thank you. Thank you both. The case just argued will be submitted. Next case on the calendar is Bailey versus Barnhart.
judges: Reinhardt, Silverman, Clifton